UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,
 ex rel., JANET WALTON and
TIM YABLONOWSKI,

      Plaintiffs,                          Case No. 2:18-cv-00818-SPC-DNF

v.

KEVIN PHILIP ROSENBACH, M.D.
and KEVIN P. ROSENBACH, M.D. P.A.

      Defendants.

_____/

**PLAINTIFF UNITED STATES OF AMERICA'S
COMPLAINT IN INTERVENTION AGAINST DEFENDANTS KEVIN
PHILIP ROSENBACH, M.D. AND KEVIN P. ROSENBACH, M.D. P.A.**

The United States of America brings this action against Kevin Philip

Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A. to recover treble damages

and penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733.

### I.    INTRODUCTION

1.    The United States brings claims against Kevin Philip Rosenbach, M.D.

and Kevin P. Rosenbach, M.D. P.A. for violations of the False Claims Act, 31

U.S.C. § 3729(a)(1)(A)-(B), for causing the submission of false and fraudulent claims

to Medicare Part B and for making, using, or causing to be made or used false

records or statements material to the submission of such claims.

2.     Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A. violated the FCA by causing to be presented false and fraudulent claims in connection with subcutaneous immune globulins

## II.     JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3730(a) because this action is brought by the United States as a Plaintiff pursuant to the False Claims Act.

4.     This Court has personal jurisdiction over Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A pursuant to 31 U.S.C. § 3732(a) because Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A reside or transact business in the Middle District of Florida and a substantial portion of Defendants' conduct in violation of 31 U.S.C. § 3729 occurred in the Middle District of Florida.

5.     Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A reside or transact business in the Middle District of Florida and a substantial part of the events or omissions giving rise to the claim occurred in the Middle District of Florida.

### III.   PARTIES

6.     The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and its component the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare Program.   Relators Janet Walton and Tim Yablonowski have filed this case under the qui tam provisions of the False Claims Act, and the Government has now partially intervened.

7.     Kevin Philip Rosenbach, M.D. ("Dr. Rosenbach") is physician who practices in allergy and immunology in Naples, Florida.

8.     Kevin P. Rosenbach, M.D. P.A is a Florida company.  Kevin P. Rosenbach, M.D. P.A is owned solely by Kevin Philip Rosenbach, M.D with a principal address of 2500 Vanderbilt Beach Road, Suite 1103, Naples, Florida.

### IV.   LEGAL BACKGROUND

**A.     The False Claims Act**

9.     The FCA establishes liability to the United States for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." 31 U.S.C. § 3729(a)(1)(A)-(B).  Individuals or entities who violate the FCA are liable to the United States for treble damages and a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment

3

Act of 1990.  31 U.S.C. § 3729(a)(1).

10.     The False Claims Act is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.

11.     "False or fraudulent claims" include more than just claims containing express falsehoods.  Claims may also be false when a defendant expressly or implicitly certifies that a claim complies with a statute, regulation, or contractual requirement ("express false certification" and "implied false certification"). *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016).

12.     For purposes of the FCA, a defendant may be liable not only when it presents false claims to the government, but also when it "causes [such claims] to be presented."  31 U.S.C. § 3729(a)(1)(A).

13.     For purposes of the FCA, "knowing" and "knowingly" are defined to include actual knowledge, reckless disregard, and deliberate indifference.  31 U.S.C. § 3729(b)(1).  No proof of specific intent to defraud is required.  *Id.*

14.     For purposes of the FCA, "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  *Id.* § 3729(b)(4).

15.     For purposes of the FCA, "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer,

4

employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]" *Id.* § 3729(b)(2).

16.    The standard of proof under the False Claims Act is preponderance of the evidence. *Id.* § 3731(d).

## V.    THE MEDICARE PROGRAM

17.    Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A.

18.    HHS is responsible for the administration and supervision of the Medicare program.  CMS is part of HHS and is directly responsible for the administration of the Medicare program.

19.    To participate in the Medicare program, a healthcare supplier must file an agreement with the Secretary of HHS (Secretary). 42 U.S.C. § 1395u(h)(1). *See also* Form CMS 460.

20. To enroll in the Medicare program, suppliers must submit a Medicare Enrollment Application, Form CMS-855B. These suppliers also must complete Form CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

21. Form CMS-855B requires, among other things, signatories to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 2A1 of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . .
>
> * * *
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* https://www.cms.gov/Medicare/CMS-Forms/CMS /Forms/Downloads/cms855b.pdf

22. An authorized official must sign the "Certification Statement" in Section 15 of Form CMS-855B, which "legally and financially binds this supplier to the laws, regulations, and program instructions of the Medicare program." *Id.*

23. The Medicare Program consists of four parts: A, B, C, and D. As alleged herein, Defendants caused to be submitted, false claims under Medicare Part B.

6

24.     Part B of the Medicare program is a federally subsidized, voluntary insurance program that pays for various medical and other health services and supplies, including lab testing, hospital outpatient services, physician services, and physical, occupational, and speech therapy services. *See* 42 U.S.C. §§ 1395j to 1395w-5.

25.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury. Eligible individuals who are 65 or older or disabled may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums. Payments under Medicare Part B typically are made directly under assignment to service suppliers rather than to the patient/beneficiary. In that case, the supplier bills the Medicare program directly.

26.     At all times relevant to this Complaint, CMS contracted with private contractors, known as Medicare Administrative Contractors (MACs), to perform various Medicare Part B administrative functions on its behalf, including reviewing and paying Medicare Part B claims submitted by healthcare suppliers. 42 U.S.C. § 1395u; 42 C.F.R. §§ 421.401 and 421.404. MACs generally act on behalf of CMS to process and pay Medicare claims and perform administrative functions on a regional level. MACs may issue Local Coverage Determinations (LCD) regarding whether a particular item or service is covered. 42 U.S.C. § 1395ff(f)(2).

27.     Local Coverage Determinations (LCDs) are decisions made by a Medicare Administrative Contractor (MAC) whether to cover a particular item or service in a MAC's jurisdiction (region) in accordance with section 1862(a)(1)(A) of the Social Security Act. The MAC's decision is based on whether the service or item is considered reasonable and necessary.

28.     CMS provides reimbursement for Medicare Part B claims from the Medicare Trust Fund.

29.     Medicare Part B covers medically necessary services, including provider visits, diagnostic tools that meet accepted standards for medical practice, procedures, medical supplies, and durable medical equipment. Medicare reimburses only those services furnished to beneficiaries that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member . . . ." 42 U.S.C. § 1395y(a)(1)(A).  Part B providers must certify that services are medically necessary. 42 C.F.R. § 424.24(g)(1).

30.     The Secretary is responsible for specifying services covered under the "reasonable and necessary" standard and has wide discretion in selecting the means for doing so. *See* 42 U.S.C. § 1395ff(a). The Secretary acts through formal regulations, and periodically CMS issues industry guidance.

31.     The Secretary provides guidance to eligible providers and suppliers pursuant to a series of Manuals, published by CMS, which are available to the public

8

on the Internet. *See generally* CMS Internet-Only Manuals, *available at*

https://www.cms.gov/medicare/regulations-guidance/manuals/internet-only-

manuals-ioms

32.    Medicare regulations require suppliers to certify that they meet, and will

continue to meet, the requirements of the Medicare statute and regulations. 42

C.F.R. § 424.516(a)(1).

33.    Enrolled providers may submit bills to the Medicare Program for

services rendered to the patients.  To obtain Medicare reimbursement for certain

outpatient items or services, healthcare suppliers submit a claim form known as the

CMS 1500 form or its electronic equivalent, known as the 837P format. When a

CMS-1500 claim is submitted, the supplier certifies that they are knowledgeable of

Medicare's requirements and that the services for which payment is sought were

"medically indicated and necessary for the health of the patient . . . ." *See*

https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf

34.    For a claim to be paid by Medicare Part B, it must identify each service

rendered to the patient by the provider or supplier. The Healthcare Common

Procedure Coding System (HCPCS) is a collection of standardized codes that

represent medical procedures, supplies, products, and services. Level I of the HCPCS

is comprised of codes defined by the American Medical Association (AMA) and

contained in the AMA publication called the Current Procedural Terminology (CPT)

Manual. These codes are referred to as "CPT codes." Level II codes of the HCPCS are defined by CMS and are updated throughout the year as necessary. Level II of the HCPCS is a standardized coding system that is used primarily to identify products, supplies, and services not included in the CPT codes. Each procedure or service is identified by either a five-digit CPT code or by Level II HCPCS code consisting of a single alphabetical letter followed by four numeric digits.

35.    CPT codes are widely used in the United States as the way medical providers seek reimbursement for professional services from healthcare payors, including Medicare, other federal healthcare programs, and many private insurers. The United States uses CPT and HCPCS codes to determine both coverage (if it will pay for the billed procedure) and reimbursement (how much it will pay for the billed medical procedure).  The American Medical Association ("AMA") defines the CPT and HCPCS codes in manuals published annually.

36.    At all relevant times, the AMA coding manual has stated these instructions for selecting appropriate codes: "Select the name of the procedure or service that accurately identifies the service performed. Do not select a CPT code that merely approximates the service provided."  Providing accurate CPT and HCPCS codes on claims submission forms is material to and a condition of payment for the Medicare Program. *See, e.g.*, Medicare Learning Network Fact Sheet, Medicare Billing: 837P and Form CMS-1500.  The Medicare Program routinely

denies payment to providers who bill for codes when the criteria for those codes is not actually met, including when the services are not reasonable and necessary.

37.     In addition to the CPT Manual, the AMA publishes the International Classification of Diseases (ICD) Manual, which assigns a unique numeric identifier to each medical condition. To be payable by Medicare, the claim must identify both the CPT code that the provider or supplier is billing for and the corresponding ICD version 10 (ICD-10) code(s) for the patient's medical condition that supports the medical necessity of the provider's or supplier's service.

38.     When submitting claims on the CMS-1500 (or its electronic equivalent) to Medicare, suppliers certify, among other things, that: (a) the services rendered are medically indicated and necessary for the health of the patient; (b) the information in the claim is "true, accurate, and complete"; and (c) the supplier understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws." Suppliers further certify that their claims comply "with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment . . . ."  CMS-1500 also requires suppliers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject

11

to civil penalties." *See* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf

39. When enrolling to submit claims electronically, suppliers certify that they will submit claims that are "accurate, complete, and truthful." *See* EDI enrollment form CMS 10164, available at https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms10164b.pdf. When a supplier submits an electronic claim, the supplier's identification number and password serve as the supplier's signature, just as if the supplier physically signed the claim form.

40. Healthcare suppliers are prohibited from knowingly presenting or causing to be presented claims for items or services that the supplier knew or should have known were not medically necessary, or knew or should have known were false or fraudulent. *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1320a-7(b)(7) (healthcare entities may be excluded for fraud, kickbacks, and other prohibited activities).

41. A supplier has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage for the Medicare services it provides. *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

42. Because it is not feasible for the Medicare program or its contractors to review medical records corresponding to each of the millions of claims for payment it receives from suppliers, the program relies on suppliers to comply with Medicare

requirements and relies on suppliers to submit truthful and accurate certifications and claims. Generally, once a supplier submits a CMS-1500 or the electronic equivalent to the Medicare program, the claim is paid directly to the supplier, in reliance on the foregoing certifications, without any review of supporting documentation, including medical records.

## VI.   PRIMARY IMMUNODEFICIENCIES

43.   Primary immunodeficiencies are inherited disorders of immune system function that predispose affected subjects to an increased rate and severity of infection, immune dysregulation with autoimmune disease and aberrant inflammatory responses, and malignancy.[1]

44.   The initial laboratory examination of humoral immunity consists of measuring levels of various immunoglobulin isotypes (IgG, IgA, IgM, and possibly IgG subclasses) in serum, as well as a measure of function or specific antibody production, which should include both protein and polysaccharide antigens.[2]

45.   There are various classes of primary immunodeficiencies, which vary in their incidence among the general population.

---

[1] Bonilla FA, Khan DA, Ballas ZK, Chinen J, Frank MM, Hsu JT, et al. *Practice parameter for the diagnosis and management of primary immunodeficiency*, J Allergy Clin Immunol 2015;136:1186-205.e1-e78.

[2] *Id.*

13

46.     Common Variable Immune Deficiency (CVID) is a primary immunodeficiency of uncertain cause affecting approximately 1 in 30,000 persons. The following findings are required to support a diagnosis of CVID: (1) at least two immunoglobulin classes (IgG, IgM, IgA) that are at least two standard deviations below normal for their age; (2) poor or absent response to immunization; and (3) the absence of any other defined immunodeficiency state.[3]

47.     Specific Antibody Deficiency (SAD) requires the demonstration of poor IgG response to polysaccharide antigens in the context of normal serum immunoglobulin concentrations.[4]  SAD is a condition that appears in approximately 10 percent of healthy individuals.[5]

---

[3] F.A. Bonilla, I. Barlan, H. Chapel, B.T. Costa-Carvalho, C. Cunningham-Rundles, M.T. de la Morena; *International consensus document (ICON): common variable immunodeficiency disorders*; J Allergy Clin Immunol Pract; Vol. 4; (2016), pp. 38-59; Lee TK, Gereige JD, Maglione PJ. *State-of-the-art diagnostic evaluation of common variable immunodeficiency*. Ann Allergy Asthma Immunol. 2021;127(1):19–27.

[4] Bonilla FA, Khan DA, Ballas ZK, Chinen J, Frank MM, Hsu JT, et al. *Practice parameter for the diagnosis and management of primary immunodeficiency*, J Allergy Clin Immunol 2015;136:1186-205.e1-e78.

[5] 22. Keswani A, Dunn NM, Manzur A, et al. *The Clinical Significance of Specific Antibody Deficiency (SAD) Severity in Chronic Rhinosinusitis (CRS)*. J Allergy Clin Immunol Pract 2017; 5:1105.

## VII.   MEDICARE PART B COVERAGE OF IMMUNOGLOBULINS

48.     In order for a beneficiary's equipment and supplies to be eligible for reimbursement under Medicare Part B, they must be "reasonable and necessary for the diagnosis or treatment of illness . . . ." 42 U.S.C. § 1395y(a)(1)(A).

49.     External infusion pumps are covered under the Durable Medical Equipment (DME) benefit (Social Security Act § 1861(s)(6)).  Subcutaneous immune globulins immune globulin products are only covered as a supply to a covered DME infusion pump.

50.     Under the applicable versions of LCD L33794 in effect from on or about October 1, 2015, through on or about September 30, 2019, subcutaneous administration of immune globulins J1559 (Hizentra); J1569 (Gammagard Liquid); and J1575 (HYQVIA)[6] were covered only if two criteria are met:

i.     The subcutaneous immune globulin preparation is a pooled plasma derivative which is approved for the treatment of primary immune deficiency disease; and

ii.     The beneficiary has a diagnosis of primary immune deficiency disease (Reference ICD-10 Codes that Support Medical Necessity Group 3 Codes for applicable ICD-10 diagnoses).

---

[6] Effective January 1, 2016, LCD L33794 added J1575 (HQVIA) as a covered subcutaneous immune globulin.

51.    Common Variable Immunodeficiency (CVID)—a rare disease affecting approximately 1 in 30,000 persons—is a primary immune deficiency disease that supports coverage of immune globulins.

52.    Specific Antibody Deficiency (SAD), a more common type of primary immune deficiency, was not a covered diagnosis for immune globulins prior to August 12, 2019.

## VIII.    DEFENDANTS' CAUSATION OF FALSE AND FRAUDULENT REIMBURSEMENT CLAIMS TO MEDICARE PART B FOR MEDICALLY UNNECESSARY IMMUNE GLOBULINS.

53.    Dr. Rosenbach's patients receiving immune globulins are identified on the Medicare Part B claims as having a CVID diagnosis.

54.    Dr. Rosenbach would change a diagnosis to CVID or add a CVID diagnosis for patients who did not meet the definition of CVID in order to obtain Medicare Part B coverage for immune globulins when the medical records did not support a diagnosis of CVID.

55.    In order to justify doing so, Dr. Rosenbach claims to rely upon an inapplicable LCD and a false definition of CVID.  Specifically, Dr. Rosenbach relies upon LCD L34007, which concerns coverage of intravenous immune globulins, not the subcutaneous administration of immune globulins at issue here.

56.    When describing coverage for of intravenous immune globulins, LCD L34007 describes "rare instances" when a patient with CVID has normal IgG levels.

16

Despite LCD 34007's description of "rare instances" when a CVID patient has normal IgG levels, Dr. Rosenbach falsely defined patients with SAD—a relatively common condition in the general population of the United States affecting approximately one out of every ten adults—as having CVID.

57.    Even following August 12, 2019, when SAD was added by CMS as a covered diagnosis for immune globulins, Dr. Rosenbach would prescribe subcutaneous immune globulins to beneficiaries diagnosed with SAD when it was not reasonable and necessary to do so.  Specifically, Dr. Rosenbach would prescribe subcutaneous immune globulins without attempting other medical treatment such a prescription of antibiotics or vaccination with conjugate vaccine Prevnar.[7]

58.    By falsely diagnosing patients with CVID, Dr. Rosenbach caused the submission of false claims to Medicare Part B by special pharmacies dispensing immune globulins to his patients.

## XI.    FALSE CLAIMS

59.    On or about October 1, 2015, through on or about September 30, 2019, Dr. Rosenbach and Kevin P. Rosenbach, M.D. P.A knowingly caused false claims for subcutaneous immune globulins to be submitted to Medicare Part B.  Each of

---

[7] Bonilla FA, Khan DA, Ballas ZK, Chinen J, Frank MM, Hsu JT, et al. *Practice parameter for the diagnosis and management of primary immunodeficiency*, J Allergy Clin Immunol 2015;136:1186-205.e1-e78.

17

these Medicare Part B claims were false or fraudulent under the False Claims Act for the reasons discussed in Section VIII, *supra*.

60.     The following are instances of false diagnoses of CVID by Dr. Rosenbach, which caused false claims for subcutaneous immune globulins to be submitted to Medicare Part B.  Dr. Rosenbach and Kevin P. Rosenbach, M.D. P.A. caused the submission of such representative claims due to the conduct alleged above.

### A.     Patient 1[8]

61.     Patient 1's Total IgG, IgM and IgA levels were within normal limits. Patient 1 did not mount a protective antibody response to diphtheria vaccine, which alone is not a sufficient indication to start IgG replacement because approximately 11 percent of elderly persons do not mount antibody responses to diphtheria.  All other antibody quantitative levels and qualitative responses to the vaccination were within normal limits. Patient 1 does not have CVID or SAD.

62.     Nevertheless, Dr. Rosenbach diagnosed Patient 1 with CVID even though she does not meet the diagnostic criteria of CVID.

### B.     Patient 2

---

[8] To protect patient privacy, patient names are omitted from this complaint and its exhibits. The United States is providing counsel for Defendants with the names of the patients under separate cover.

63.     Patient 2's Total IgG, IgM and IgA levels were within normal limits. She does not have functional hypogammaglobulinemia and her titers to tetanus and diphtheria are protective at baseline and still protective after booster.

64.     Nevertheless, Dr. Rosenbach diagnosed Patient 2 with CVID even though she does not meet diagnostic criteria of CVID.

### C.     Patient 3

65.     Patient 3 met the criteria for a diagnosis of hypogammaglobulinemia (low IgG) but did not meet diagnostic criteria for CVID, which requires (1) at least two immunoglobulin classes (IgG, IgM, IgA) that are at least two standard deviations below normal for their age; (2) poor or absent response to immunization; and (3) the absence of any other defined immunodeficiency state.

66.     Nevertheless, Dr. Rosenbach diagnosed Patient 3 with CVID even though she does not meet diagnostic criteria of CVID.

### D.     Patient 4

67.     Patient 4 does not meet criteria for CVID, as his quantitative IgG and IgM were within normal limits.  Patient 4 did not have any IgA documented to meet the diagnostic criteria for CVID.   Patient had chronic mycobacterium and herpes virus infections, which are not typical of CVID since the typical pathogens are encapsulated bacteria like pneumococcus.

19

68.     Nevertheless, Dr. Rosenbach diagnosed Patient 4 with CVID even though she does not meet the diagnostic criteria of CVID.

### E.     Patient 5

69.     Patient 5's Total IgG, IgM and IgA levels were within normal limits.

70.     Nevertheless, Dr. Rosenbach diagnosed Patient 5 with CVID even though she does not meet the diagnostic criteria of CVID.

### F.     Patient 6

71.     Patient 6's Total IgG, IgM and IgA levels were within normal limits.

72.     Nevertheless, Dr. Rosenbach diagnosed Patient 6 with CVID even though she does not meet the diagnostic criteria of CVID.

### G.     Patient 7

73.     Patient 7's Total IgM and IgA levels were within normal limits, and her Total IgG level was not two standard deviations below normal for her age.

74.     Nevertheless, Dr. Rosenbach diagnosed Patient 7 with CVID even though she does not meet the diagnostic criteria of CVID.

### H.     Patient 8

75.     Patient 8 met the criteria for a diagnosis of hypogammaglobulinemia (i.e. low IgG) but did not have any IgM or IgA level documented to meet the diagnostic criteria for CVID.

76.     Nevertheless, Dr. Rosenbach diagnosed Patient 8 with CVID even though she does not meet the diagnostic criteria of CVID.

### I.     Patient 9

77.     Patient 9's Total IgG, IgM, and IgA levels were within normal limits. Patient 9 had recurrent urinary tract infections that can be attributed to structural contributors such renal stone and ureteral stricture. Staph skin infections are not a feature of humoral immune deficiency but rather infections with encapsulated bacteria like pneumococcus. Patient 9's infections did not seem to improve despite very high doses of IgG replacement.

78.     Nevertheless, Dr. Rosenbach diagnosed Patient 9 with CVID even though she does not meet the diagnostic criteria of CVID.

### J.     False Claims Submitted to Medicare Part B by Specialty Pharmacies

79.     Dr. Rosenbach's false CVID diagnoses caused the following payment of false claims from on or about October 1, 2015, through on or about September 30, 2019:

| Beneficiary and Billing Specialty Pharmacy Provider Name | J1559 | J1569 | J1575 | Grand Total |
|---|---|---|---|---|
| **PATIENT 1** | | | | |
| BARNES HEALTHCARE OF FL LLC | | | $13,619.64 | $13,619.64 |
| BIOPLUS SPECIALTY INFUSION CA, LLC | | $3,292.60 | $68,098.20 | $71,390.80 |
| CORAM ALTERNATE SITE SERVICES INC | | | $120,434.56 | $120,434.56 |
| CORAM HEALTHCARE CORPORATION OF FLORIDA | | | $72,946.11 | $72,946.11 |
| **PATIENT 2** | | | | |
| BARNES HEALTHCARE OF FL LLC | | | $10,895.72 | $10,895.72 |
| CORAM HEALTHCARE CORPORATION OF FLORIDA | | $3,292.61 | $233,667.01 | $236,959.62 |
| **PATIENT 3** | | | | |
| ACCREDO HEALTH GROUP INC | $150,929.24 | | | $150,929.24 |

| PATIENT 4 | | | | |
|---|---|---|---|---|
| BIOMED PA, INC. | $103,214.09 | | | $103,214.09 |
| SOLEO HEALTH INC | $66,942.68 | | | $66,942.68 |
| PATIENT 5 | | | | |
| BIOPLUS SPECIALTY INFUSION CA, LLC | | $9,877.83 | $213,628.65 | $223,506.48 |
| UNIVERSITY HOSPITALS ST. JOHN MEDICAL CENTER | | $19,614.30 | | $19,614.30 |
| PATIENT 6 | | | | |
| BARNES HEALTHCARE OF FL LLC | | | $30,615.99 | $30,615.99 |
| BIOPLUS SPECIALTY INFUSION CA, LLC | | | $89,889.69 | $89,889.69 |
| CORAM ALTERNATE SITE SERVICES INC | | | $6,132.13 | $6,132.13 |
| CORAM HEALTHCARE CORPORATION OF FLORIDA | | | $200,466.55 | $200,466.55 |
| PATIENT 7 | | | | |
| ACCREDO HEALTH GROUP INC | | $4,938.92 | $68,079.43 | $73,018.35 |
| PATIENT 8 | | | | |
| CORAM ALTERNATE SITE SERVICES INC | | | $10,220.22 | $10,220.22 |
| CORAM HEALTHCARE CORPORATION OF FLORIDA | | | $47,891.04 | $47,891.04 |
| CORAM HEALTHCARE CORPORATION OF MASSACHUSETTS | | | $15,338.17 | $15,338.17 |
| OPTUM INFUSION SERVICES 550 LLC | | | $208,646.70 | $208,646.70 |
| PATIENT 9 | | | | |
| BARNES HEALTHCARE OF FL LLC | | | $10,895.72 | $10,895.72 |
| CORAM HEALTHCARE CORPORATION OF FLORIDA | | | $189,111.45 | $189,111.45 |
| **Grand Total** | **$321,086.01** | **$41,016.26** | **$1,610,576.98** | **$1,972,679.25** |

## IX.   DEFENDANTS BENEFITTED BY CAUSING FALSE CLAIMS

80.     Dr. Rosenbach was aware of his status as a heavy prescriber of subcutaneous immune globulins and accepted benefits from drug company and special pharmacy representatives.  *See U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003) ("Facts that show a defendant's motive to commit the fraud may sometimes provide a factual background adequate for an inference of fraudulent intent.").

81.     For instance, Dr. Rosenbach was notified by a CVS representative that Dr. Rosenbach was the number one prescriber of subcutaneous immune globulins for

22

CVS in the United States.  Dr. Rosenbach demonstrated that same knowledge through his communications.

82.     In November 2017, Dr. Rosenbach sent a facsimile to CVS regarding what Dr. Rosenbach considered inadequate pre-authorizations:



"I am the number one immunoglobulin prescriber for CVS and you are making my staff do your job. I only get reimbursed $150 / office visit or $600 / yr (4 visits) per patient. CVS is making at least $12 million this year from my prescriptions." (highlights supplied).

83.     Dr. Rosenbach also communicated with a specialty pharmacy representative regarding the regular meals he enjoyed with other specialty pharmacy representatives as a basis for those specialty pharmacies receipt of his referrals:

midnight Thursday night.  If you can provide service for my patients and take the burden of responsibility for the paperwork off my staff, you'll get patients. That's why we have a good relationship with these reps. We go to dinner once a week with Alex and Alen. Besides offering you to come into the office every Thursday, I also offered to go to dinner with you at some point. You said that made you uncomfortable, which is fine. I'm busy as it is. Me taking away evening time away from my work to spend with with someone is more of a sacrifice on my part. I go to dinner with Alex every 10 days and Alen once a week because we have a great rapport, and we are friends. Professional relationship, business relationship, and personal relationship. These guys are supportive of all three. Brad has been out of CVS for 6 months, and I am still close friends with him and his wife.

(highlights supplied).

84.    Dr. Rosenbach's staff also solicited and received benefits from drug

company representatives:

```
> On Apr 25, 2017, at 10:51 AM, Gonzalez, Cristina M. <cristina.gonzalez@baxalta.com> wrote:
>
> of course
>
> Sent from my iPhone
>
>> On Apr 25, 2017, at 10:33 AM, Care One Healthcare <PID@naplesallergycenter.com> wrote:
>>
>> Do you want to buy us lunch , please ?
>>
>> -----Original Message-----
>> From: Gonzalez, Cristina M. [mailto:cristina.gonzalez@shire.com]
>> Sent: Tuesday, April 25, 2017 10:25 AM
>> To: Care One Healthcare
>> Subject: Re: 05.04.17 MLMS Invite
>>
>> Yes. May be more like 1115
>>
>> Sent from my iPhone
>>
>>> On Apr 25, 2017, at 10:15 AM, Care One Healthcare <PID@naplesallergycenter.com> wrote:
>>>
>>> HI Cristina, Are you still coming in today at 11?
>>>
>>> Missy
...
```

. . . .

---

**From:** Mustac, Alen [mailto:alen.mustac@biofusioninc.com]
**Sent:** Wednesday, November 01, 2017 11:32 AM
**To:** Naples Allergy Center
**Subject:** Re: Dr. Rosenbach

I didn't hear back I picked up a lunch Friday. I can still send a breakfast regardless. What's up w Thursday crazy busy I'm assuming

On Nov 1, 2017, at 10:24, Naples Allergy Center <PID@naplesallergycenter.com> wrote:

Do you want to bring breakfast on Friday morning ?

(highlights supplied).

## FIRST CAUSE OF ACTION
### (False or Fraudulent Claims Against Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A.)
### (False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

85.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1-84.

86.     This cause of action is brought against Defendants Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A.

87.    By virtue of the acts described above, from October 1, 2015, through on or about September 30, 2019, Defendants Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A. knowingly caused to be presented false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, Defendants Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A. knowingly made or presented, or caused to be made or presented, claims for payment for fraudulent claims in connection with subcutaneous immune globulins that were not medically necessary.  Examples of these claims are described in paragraphs 59-79.

88.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A.'s conduct.

89.    Had Medicare Part B known these facts, it would not have paid these claims.

25

90.     By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent claim.

**SECOND CAUSE OF ACTION**
**(False Records or Statements Material to False Claims**
**Against Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A.)**
**(False Claims Act, 31 U.S.C. § 3729(a)(1)(B))**

91.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1-84.

92.     This cause of action is brought against Defendants Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A.

93.     By virtue of the acts described above, from October 1, 2015, through on or about September 30, 2019, Defendants Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A. knowingly caused to be made or used, false records or statements, namely, claims for payment for fraudulent claims in connection with subcutaneous immune globulins that were not medically necessary that were paid and approved by the Medicare Part B and, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B). Examples of these claims are described in paragraphs 59-79.

94.     Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants Kevin Philip Rosenbach, M.D. and Kevin P. Rosenbach, M.D. P.A.'s conduct.

95.     Had Medicare known these facts, it would not have paid these claims.

26

96.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false record or statement material to a false or fraudulent claim.

**PRAYER FOR RELIEF AND JURY DEMAND**

WHEREFORE, the United States respectfully prays for judgment in its favor as follows: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

All other and further relief as the Court may deem just and proper.

The United States hereby demands a jury trial on all claims alleged herein.

DATED this 29th day of April, 2026.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By:    _/s/ Chad C. Spraker_____
CHAD C. SPRAKER
Assistant United States Attorney
USA No. 198
2110 First Street, Ste. 3-137
Fort Myers, Florida 33901
Telephone: 239-461-2200
Email: chad.spraker@usdoj.gov

27